THOMAS B. W. STOCKTON AND CHAUNCEY S. PAYNE *v.* GARDNER D. WILLIAMS, KINTZING PRITCHETTE, CALVIN SMITH, THOMAS J. DRAKE, AND ELIZABETH LYONS.

Where parties are trying the right to lands at law, and the title of the defendants at law is a legal and not an equitable title, with nothing to prevent their establishing it as fully at law as in a court of equity, this Court will not interfere, but will leave them to establish their defence at law.

Where the defendant in such case, instead of demurring, submits to answer, and does not in his answer insist on the objection as a bar to the jurisdiction of the Court, and proofs are taken in the cause, it is too late to raise the objection at the final hearing.

Where a treaty makes no special provision for deciding questions of individual identity, they must be decided by the judicial tribunals of the country.

A complainant under the act of 1840, must show a *complete* title in himself, or a right to such title, before he can call upon a defendant to release.

By the treaty made at Saginaw, September 24th, 1819, the individual reservees obtained a legal title to the lands reserved, which attached as soon as the lands were located, and required no further action to complete it.

The title to lands may pass by act of Congress, or treaty stipulation, as well as by patent.

By the Saginaw treaty, the Indian title to the lands reserved did not pass to the United States, but the treaty operated as a release both by the Indians and the government, of all interest which either had in the lands reserved to the respective reservees in fee simple.

Where a time had been set for the examination of one of the defendants' witnesses, and the commissioner and complainants' counsel attended and waited an hour and a half, during which time defendants did not appear with their witness, and complainants then left, refusing to wait longer, *held* that new notice should have been given them; and the deposition of the witness taken after complainants had left, without such notice was suppressed.

The reservations of certain lands in the treaty of Saginaw are public donations, made by the Chippewa nation to individuals; and, where two persons of the same name claim a particular reservation, hearsay evidence is admissible to show for whom it was intended. *General hearsay* or public reputation at the time of the treaty among the Indians and those present at it, and among the Indians since that time and before any controversy arose, is good evidence for that purpose; so is evidence of what a person has said before such controversy arose, who was present at the treaty, and would be likely from the circumstances to know for whom the donation was intended, and is dead. But evidence of the declarations of a living person under such circumstances cannot be received.

What a witness has heard *post litem motam*, (by which is meant since the dispute has arisen, and not merely the commencement of suit,) is not evidence.

Where the complainants under the statute of 1840, in order to obtain the decree sought, were required to substantiate their own title, *held* that the defence of one defendant enures to the benefit of the rest.

BILL to remove a cloud on complainants' title.

The bill was filed June 11th, 1840, and stated that, by a treaty between the United States and the Chippewa Indians, concluded on the 24th of September, 1819, Mokitchenoqua alias Nancy Smith, (and since her intermarriage with Alexander D. Crane, Nancy Crane,) became entitled to a section of land near the Grand Traverse of the Flint river. That she was of Indian descent, and the reputed daughter of Jacob Smith, an Indian trader, and that she had always been known and recognized among the Chippewa Indians by the name of Mokitchenoqua. That other sections were reserved at the same place for

other persons of Indian descent; and that, to give full effect to the treaty, it became necessary for the Executive of the United States not only to cause to be located and surveyed the several sections, according to the object, intent and meaning of the treaty, but also to designate, identify, recognize and put into possession of the different sections, the several individuals entitled to each; which was attended with many difficulties, by reason of the little intercourse which had existed between the claimants and the Indians on the one hand, and the citizens of the United States on the other; and because different persons claimed the same land under the same name. That the President caused the several sections that were to be located at the Grand Traverse, amounting in all to eleven, to be surveyed and located under the treaty; and designated section number eight on the plat of the survey for Mokitchenoqua. That the Secretary of the Treasury, under the direction of the President, instructed the Register and the Receiver of the land office at Detroit to investigate and determine the respective persons to whom the lands belonged; and that they, after investigating the matter, determined Nancy Crane was the person called Mokitchenoqua in the treaty, and certified their determination, and the evidence taken by them, to the general land office at Washington, which determination, after having been received by the commissioner of the land office, was confirmed August 5th, 1835, and a certificate given on the same day that Mokitchenoqua, alias Nancy Crane, formerly Nancy Smith, was entitled to said section eight, agreeably to the treaty. June 30th, 1835, Nancy Crane and her husband released all their interest to John Garland, from whom the complainants derived their title; and she and her husband afterwards, February 10th, 1837, deeded two-thirds of the same to Calvin Smith and Thomas J. Drake, who were

charged with notice of Garland's deed.   That, March 7th, 1840, a patent was issued to Mokitchenoqua, alias Nancy Crane, wife of Alexander D. Crane, formerly Nancy Smith.   That Elizabeth Lyons, assuming the name of Mokitchenoqua, pretended and insisted she was the person meant by the treaty, and presented her claim to the Register and Receiver at Detroit, who gave her a certificate to that effect, which certificate was afterwards superceded by the certificate given to Nancy Crane.   That Elizabeth Lyons, still pretending to have some right or interest, on the 4th of April, 1838, deeded the section to Gardner D. Williams and Kintzing Pritchette, who, in February, 1840, caused an action of ejectment to be brought against the complainant Payne.   The bill prayed defendants might be decreed to release their claim to the premises, and Williams and Pritchette be restrained from prosecuting their action of ejectment.

Williams, by his answer, admitted the making of the treaty, the reservation by it of eleven sections of land at the Grand Traverse of Flint river, and that one of the number was reserved for a girl named Mokitchenoqua; but denied Nancy Smith was the person intended, or that she was known by that name among the Chippewa Indians.   He also admitted the several sections had been surveyed, marked and numbered, and section eight assigned to Mokitchenoqua under the treaty; admitted the instructions given to the Register and Receiver of the land office at Detroit, and the patent of March 7th, 1840, as stated in the bill, but insisted that he and Pritchette were not affected by them.   Stated that Elizabeth Lyons, the daughter of Archibald Lyons, an Indian trader, was the person intended by the treaty.   That Mokitchenoqua was her Indian name, that it was given to her by the Indians when she was an infant, and before the treaty of Sa-

ginaw; that the chiefs at the treaty intended to give her a section of land, and that the same was reserved for her by her Indian name of Mokitchenoqua. That she received a certificate from the Register of the land office at Detroit; that she was Mokitchenoqua, and that she was the first, and for many years the only applicant, and received her certificate of identity August 2d, 1824. That Marie Lavoy received a like certificate February 7th, 1827, and Nancy Crane January 22d, 1831. That Elizabeth Lyons, on the 4th of April, 1838, conveyed to Williams and Pritchette, who had brought an action of ejectment against Payne.

Pritchette put in a similar answer, and the bill was taken as confessed against the other defendants, Elizabeth Lyons, Thomas J. Drake, and Calvin Smith.

*Fraser, Romeyn and Davidson*, for complainants.

*Walker and Hunt*, for Williams.

*W. Hale*, for Pritchette.

*A. D. Fraser.* The complainants are entitled to the relief sought, on the following grounds.

1. A patent having duly and according to law been issued by the government of the United States for the section of land in dispute, it is incumbent on the defendants to get rid of the patent, by taking the proper steps with that view, and showing that the officer who executed the same transcended his powers, or that the transaction was tainted with fraud.

To set aside the patent, the defendants must proceed directly, by *scire facias*, or bill in chancery.

2. *Adverse possession.* The defendants admit the possession, occupancy and improvements of the land in ques-

tion, by complainants, prior to the date of the deed from E. Lyons to the defendants Williams and Pritchette. This operates as a bar.

3. *Champerty and maintenance.* The defendants conceding the occupancy and improvements of the complainants, any grant executed by any other person was void.

4. The pleadings admit the allegations in the bill of complaint, and matter in avoidance or discharge set up in the answer, must be proved.

5. Indian testimony is not entitled to much if any weight at all.

The reporter has not been furnished with briefs by the other counsel for the complainants.

*H. N. Walker,* contra.

I. It appears by the treaty of Saginaw, of 1819, that the land in dispute was granted to an Indian girl named Mokitchenoqua. Each party claims to hold under the person named in the treaty, although their titles are derived through different individuals. The question of identity must be decided by the judicial tribunals.

II. The treaty is perfect, and conveys to the several persons named, the land mentioned, in fee simple. It is no objection to the grant that the land has to be designated by the President.

III. If Elizabeth Lyons was the person named in the treaty, the patent cannot give the complainants any title to demand a surrender of the claims of herself or her assigns.

1. A patent is no bar to the assertion of equitable rights existing before its date.

2. A grant is absolutely void where the state has no right or title to the thing granted, or when the officer has no authority to issue the grant.

IV. The ground of adverse possession is no foundation for offensive operations. If of any validity, it can only be set up as a defence.

V. The same objection applies to champerty and maintenance. We insist, moreover, that the doctrine of champerty and maintenance is not law in this state.

THE CHANCELLOR. · The statute under which the complainants filed their bill, *Laws* 1840, *p.* 127, provides that any person, having the possession and legal or equitable title to lands, may institute a suit against any other person or persons, setting up a claim thereto, and if the complainant shall be able to substantiate his title to such land, the defendant shall be decreed to release to the complainant all claim thereto. The defendants, Williams and Pritchette, insist that, inasmuch as they had brought an action of ejectment against Payne, for the purpose of trying their title at law, before the complainants filed their bill in this Court, the bill of complaint should be dismissed as to them for want of jurisdiction under the statute, which they contend should be construed to apply to claims only which the party was not proceeding to establish at law, at the time of filing the bill. The object of the statute seems to be to enable a person in possession of real estate, and having a title thereto, to remove all doubts in regard to his title arising from the claims of third persons who are taking no steps to test the validity of their claim, either at law or in equity, and who, by their refusal or neglect to institute proceedings for that purpose, keep the party in possession in a state of suspense. This is the extent, I think, to which this Court should go under the statute. A different construction of the act would leave it optional with every defendant in ejectment to litigate his title either at law or in this Court, and, by filing his bill here, to take from his ad-

versary the right to have the facts of the case passed upon by a jury of the country.  Such, therefore, it seems to me, is the construction that should be given to the statute, where the title of the defendant in ejectment is a legal and not an equitable title, and there is nothing to prevent his establishing it as fully at law as in a court of equity.  But the defendants come too late with their objection. They should have demurred to the bill, or insisted on the want of jurisdiction in their answer, as a bar to the Court's taking cognizance of the suit.  *Grandin* v. *LeRoy*, 2 *Paige R.* 509.  Where the defendant, instead of demurring, submits to answer, and does not insist on the objection in his answer as a bar to the jurisdiction of the court, and thereby put the complainant on his guard as to further proceedings, and proofs are taken in the cause, it is too late to raise the objection on the final hearing.

Having disposed of the question of jurisdiction, I will proceed to decide such other questions raised on the argument, as are necessary to a decision of the case.

Article third of the treaty says: " There shall be reserved, for the use of each of the persons hereinafter mentioned, and their heirs, which persons are all Indians by descent, the following tracts of land;" and, after making a number of reservations, proceeds as follows: "For the use of Nowokeshik, Metawanene, Mokitchenoqua, Nondashemau, Petabonaqua, Messawwakut, Checbalk, Kitchegeequa, Sagosequa, Annoketoqua, and Tawcumegoqua, each, six hundred and forty acres of land, to be located at and near the Grand Traverse of the Flint river, in such manner as the President of the United States may direct." Under this part of the treaty, and in pursuance of the last clause of it, eleven sections of land were surveyed and located by the direction of the President, at the Grand Traverse of the Flint river, and one of said sections as-

signed to each of the aforesaid reservees; section eight being assigned to Mokitchenoqua. There are two persons who claimed that name and the aforesaid section; both females, both of Indian descent, and both half-breeds;— their mothers being Indians, and their fathers white men. The complainants derive their title from one of these females, and Williams and Pritchette from the other; the former from Nancy Smith, the daughter of Jacob Smith, an Indian trader, and the latter from Elizabeth Lyons, who is also a defendant, the daughter of Archibald Lyons, another Indian trader. Such is the origin of the present suit. The complainants contend that Nancy Smith was the person intended by the treaty, and Williams and Pritchette that Elizabeth Lyons was that person. Before examining the evidence on this point, it is necessary to decide another point made by the complainants, viz: Whether it is competent for this Court, in the present suit, to decide which of these persons was meant by the treaty? It is contended the patent of March 7th, 1840, recognized Nancy Smith as that person, and vested the title in her; and that this Court cannot go back of the patent. Now, there is nothing in the treaty authorizing the President, or any other officer of the government, to decide which of these two individuals, Nancy Smith or Elizabeth Lyons, is the true Mokitchenoqua or person meant by the treaty. This question, (if necessary,) like all others, must be decided by the judicial tribunals of the country. It can be decided in no other way, as the treaty has not provided for its decision. Supposing it, therefore, to be true that the President, by issuing a patent to "Mokitchenoqua, (*alias* Nancy Crane, wife of Alexander D. Crane, formerly Nancy Smith,") has decided that Nancy Smith is the person meant by the treaty; and suppose it also to be true that no title to the land passed by the treaty, and that a patent

was necessary to transfer the legal title from the government to the reservees under the treaty; still, so long as the question has been raised, this Court is bound to decide it. For, if, on investigation, it should turn out that Elizabeth Lyons, and not Nancy Smith, was the person intended, the equitable title would be in Elizabeth Lyons or her grantees, notwithstanding the legal title might be in the complainants; and, that being the case, this Court would not decree the defendants to release such equitable title to the complainants, whose grantor had improperly and wrongfully obtained the legal title. The complainants must show a complete title in themselves, or a right to such title, before they can call upon the defendants to release. It is not enough that they show a legal title to the premises, if the defendants have the equitable title, unless they likewise show that they are in equity entitled to the equitable title also. I am of opinion the legal title to the land after it was located passed by the treaty, and not by the patent. The treaty, after reserving to Mokitchenoqua and the other reservees six hundred and forty acres of land each, says it shall "be located at and near the Grand Traverse of the Flint river, in such manner as the President of the United States may direct." It makes no mention of a patent, nor does it require the President or other officer of the government, after the lands have been located, to do any act whatever recognizing the right of the several reservees to the different sections. All it required of the President was to have the lands located, at and near a particular place pointed out by the treaty. To locate does not mean to patent, but to have the several sections surveyed and marked out, and a map made of them, showing the particular section belonging to each of the reservees. This was done; and, when it was done, this part of the treaty was fully executed on the part of

the government.   Nothing further was required to carry it into effect, and the title then vested in the respective reservees, unless we hold the treaty itself to be clearly defective, in not providing for the execution of its several stipulations.   A patent, although the usual, is by no means the only mode in which the title to the public domain can pass from the government to an individual.   It may pass by an act of Congress, or by a treaty stipulation, as well as by a patent.   The Indian title to the land reserved, did not pass to the United States by the treaty, which operated as a release, by both the Indians and government, of all interest either had in the lands reserved to the respective reservees, in fee simple; and it would be a violation of the treaty for the government to claim the land in question.

It is necessary, in the next place, to determine the nature and character of the evidence, by which the parties must establish their rights under the treaty.   This is no easy task.   The testimony is voluminous, and exceptions have been taken by one party or the other to nearly the whole of it, and the case itself is peculiar.   I shall therefore not notice each particular exception, but proceed to lay down such rules as should, in my opinion, determine the kind of evidence to be received, and the circumstances under which it is admissible; holding, at the same time, such parts of the testimony taken as come within these rules, as competent evidence, and such parts as do not come within them, as incompetent.

I will first, however, dispose of a motion made at the hearing, to suppress the depositions of Than-en-dag-a-na and Charles H. Rood, for irregularity.   The commissioner before whom these witnesses were examined, after having taken the examination of a number of other witnesses, adjourned over to nine o'clock the next morning.   At the

Stockton *v.* Williams.

hour appointed, the commissioner and counsel of the complainants appeared, and waited until half past ten o'clock for the defendants; when, neither the defendants nor their counsel or witness appearing to proceed with the examination, the complainants' counsel left, insisting that he was not bound to wait longer for the defendants. At eleven o'clock the defendants appeared, and took the depositions of the witnesses above stated, no one appearing for the complainants. An hour and a half, during which time neither the opposite party, counsel, nor witness appeared to proceed with the examination, was, I think, sufficient indulgence shown to the defaulting party. It would be oppressive, under such circumstances, to require one party to wait longer for the other. If the defendants, or their counsel, had been present, and the examination had been delayed by the non-attendance of a witness, the case would have been different. The defendants should have given notice anew of the examination of these witnesses, before taking their testimony. Their depositions must therefore be suppressed.

Hearsay evidence is admissible to show which of the two persons claiming under the treaty by the same name is the person intended. I cannot well see how the right of either can be established without the aid of this kind of evidence. The reservations were donations made by the Indians to the several reservees named in the treaty, and formed a part of the consideration received by them for the lands ceded to the government. They were not the donations of an individual, but of the Chippewa nation, or people, by a public act of theirs, which concerned alike the whole Chippewa nation. This case, then, comes within the exception of the general rule excluding hearsay evidence; which exception admits it on questions of public right, as to prove a custom, a right of common, public

boundaries, highways and the like. 1 *Stark Ev.* 60 ; 1 *Phil. Ev.* 248 ; *Cow. and H. notes on Phil. Ev. vol.* 2, *notes* 475 *and* 477 ; *Greenleaf's Ev.* 152. Hearsay evidence is admitted in such cases, because, the public having an interest in the question, the right is supposed to have been a subject of frequent discussion with individuals, having the same inducements, and equal means to obtain correct information relating to it. It is admitted usually, though not always, from the necessity of the case, on questions touching ancient rights or pedigree. The right in controversy, it is true, is not an ancient right, the treaty having been made in 1819, a little more than twenty-three years ago ; yet the same necessity exists for admitting this kind of evidence in this case, as in cases involving ancient rights, viz : the utter impossibility of proving by any other kind of evidence whether Nancy Smith, or Elizabeth Lyons, is the person for whom the reservation was made.

This kind of evidence, at best, is not very satisfactory, and must be admitted under certain restrictions and limitations. General hearsay, or public reputation, at the time of the treaty, among the Indians and others present at the treaty, and among the Indians since that time and before any controversy arose among the different claimants, is good evidence. So is evidence of what a person who is dead has said, who was present at the treaty, and would be likely from that circumstance to know for whom the reservation was made. *Raborg* v. *Hammond,* 2 *Har. & Gill,* 42, 52 ; *Cow. & H. notes to Phil. Ev. vol.* 2. *p.* 615, *note* 462 ; *Weeks* v. *Sparks,* 1 *M. & S.* 679, *per LeBlanc J.* 688. The declarations of Jacob Smith and Archibald Lyons, are admissible on this ground. General hearsay, or reputation, is made up of the declarations of individuals ; but, what a particular person has said, who was at the treaty, and who is still living, and might be used as a witness, should not

be received.   The individual himself, should be made a witness, that the adverse party might have an opportunity to test the correctness of his information, by inquiring into its source, and the opportunities he had for obtaining it. But what a number of individuals have been heard to say on the subject, is evidence of general reputation; the weight to be given to such testimony, depending on the numbers, whether few or many, from whom the witness received his information.

What the witness has heard *post litem motam*, or since the dispute has arisen, (for that is what is meant, and not the commencement of the suit,) is not evidence.  *The Berkley Peerage case*, 4 *Camp. R.* 401; *Richards* v. *Basset*, 10 *Barn.& Cres. R.* 657 ; *Doe dem. Tilman* v. *Tarver*, *Ryan & Moody R.* 141; *Monkton* v. *The Attorney General*, 2 *Russ. & Myl.* 160.   It should appear that the declaration or information, came from a person who was likely to know the truth of what he stated, and who had no motive at the time to misrepresent it, or, in the language of Lord Eldon, in *Whitlocke* v. *Baker*, 13, *Ves. R.* 514, the declaration should be "the natural effusion of a party, who must know the truth, and who speaks upon an occasion when his mind stands in an even position, without any temptation to exceed or fall short of the truth."  To admit declarations made after a controversy had arisen, touching the subject matter, would open a door for the fabrication of testimony, and of imposition on the court, and in all probability would, in the long run, be productive of more evil than the rejection of hearsay evidence altogether.   And to fix on the commencement of the suit, as the dividing line, would be little better than no rule; for it would still be in the power of a party, before suit brought, to corrupt the only medium through which the truth might be attained.   No rule, except the one stated, will effectually guard against abuse.

The *lis mota*, in the present suit, dates as far back as February 7th, 1827. No less than three persons, at different times, obtained certificates from the Register and Receiver of the land office at Detroit, identifying the applicant as the person intended by the treaty. The first was Elizabeth Lyons, who obtained her certificate August 2d, 1824. The next was Marie Lavoy, who obtained a certificate February 7th, 1827; and the last, Nancy Smith, alias Crane, who obtained her certificate, July 22d, 1831. There were then, as early as February 7th, 1827, if not before, two claimants to the land, under the treaty. The question, who is Mokitchenoqua? began to be agitated. And in 1828, or 1829, according to the testimony of Antoine Campau, the chiefs held a council at Saginaw, to prove, as the witness states, before one Stanard, a justice of the peace, and in the presence of Archibald Lyons, that they had, at the treaty, given his daughter, Mokitchenoqua, a section of land at the Flint. This was within one or two years after Marie Lavoy had obtained her certificate; and it shows the solicitude Lyons felt for his daughter's claim, as well as the danger there would be in admitting declarations made since February 7th, 1827.

There is sufficient evidence, I think, that the Indian name of both Nancy Smith, and Elizabeth Lyons, was Mokitchenoqua, at, and previous to the making of the treaty. Neither of them was with the Indians at that time, nor has either been with them since. They had previously been taken from among them, when quite young, to be brought up with the whites. These circumstances, with the length of time that has since elapsed, sufficiently account for the evidence not being more full and explicit on this point. Under the rules stated, much of the testimony taken, must be rejected; and that, having a direct

bearing on the question, who was meant by Mokitcheno-qua, in the treaty, I will now proceed to state.

*First.* On the part of the complainants.

*Henry Connor*, was interpreter at the treaty. Does not know that any reservation was made at the treaty for Elizabeth Lyons, but has heard it talked of since.

*Robert A. Forsyth*, was present at the treaty; was, at the time, in the Indian department; knows of reservations having been made at the treaty for certain children of Indian descent, and of a number of sections having been reserved for the children of Jacob Smith. Witness was private secretary to Governor Cass, who was the commissioner on the part of the government. Jacob Smith handed to the commissioner the names of certain persons, for whom reservations were to be made; thinks the name of Mo-kitch-e-wee-no-qua was on the list. Saw but two lists of the names; Jacob Smith handed in one, and Henry Campau, or Louis Beaufait, the other. Witness copied the draft of the treaty; does not remember having seen any other lists than the ones mentioned; does not know the number of names on the list handed in by Jacob Smith; does not recollect Smith handed in more than one list; does not recollect the other names, or the number of names on the list.

*Louis Beaufait*, acted as interpreter for the Indian department, at the treaty of Saginaw. Witness thinks Jacob Smith, a few months after the treaty, showed him a list of names, containing at least five in number; among them was the name of Mo-kitch-e-wee-no-qua;—said he had got a section of land for each;—that he had done pretty well at the treaty, or words to that effect;—that he had got five sections of land; but will not be positive that was the exact number.

*Cecil Boyer*, was at the treaty; was told by Jacob Smith,

To-an-dag-e-nee, Kish-caw-ko, and by all the other chiefs, that a reservation had been made for Mo-kitch-e-wee-no-qua, daughter of Jacob Smith, at the Grand Traverse of the Flint river;—was told so while at the treaty. Asked the chiefs for whom reservations had been made, and they told her that she had one, and Mo-kitch-e-wee-no-qua had one, and a number of others had received one. Jacob Smith had no child of Indian descent, except Mo-kitch-e-wee-no-qua, to the knowledge of witness. Archibald Lyons had a child of Indian descent ;—it was a girl ;—does not know its Indian name, and has never heard it. Heard there was a section of land reserved for Lyons's daughter, at that treaty, at Shiawassee. She does not know of her own knowledge, there was a section reserved for Lyons's daughter at the treaty, but heard afterwards there was one granted to her at Shiawassee. She heard it from the Indians.

*Macons*, alias *Esh-ton-a-quot*, was at the treaty ; knows Jacob Smith had a daughter named Mo-kitch-e-wee-no-qua, by an Indian woman, and that a reservation was made for her at the treaty. That the land reserved for her was situate at the crossing of the Flint river, and it was reserved there for no person else except Mo-kitch-e-wee-no-qua. Witness was at the treaty ground among the first, and knows said reservation was made for Mo-kitch-e-wee-no-qua, and for no one else, from the fact that he was there. The last time he saw Mo-kitch-e-wee-no-qua, was at the treaty of Saginaw. He knows Archibald Lyons. Lyons came to the treaty ground two days after the treaty was ended. The treaty lasted ten days, and witness was present the whole time. There was one section reserved for Mo-kitch-e-wee-no-qua, and one for Mr. Boyer, which were all the lands reserved by the treaty, to his knowledge. Mo-kitch-e-wee-no-qua came to the

treaty with her uncle Now-we-tuck-que-to.  Witness never saw her as he remembers before the treaty, and she was then about fifteen years old.   Does not know the chiefs put in any claim for Lyons's daughter.   Smith, at the treaty, claimed a section of land for his daughter Mo-kitch-e-wee-no-qua;—does not know he ever claimed it afterwards.   Does not know Smith claimed more than one section of land  for any of his children.   Two sections were reserved for the Rileys.

*Second.*   Testimony on the part of the defendants.

*Rose Campau.*  Elizabeth Lyons was brought up in witness's family, and has lived with witness ever since she was a year old.   Witness heard from the persons who attended the treaty from Detroit, on their return, and soon after, that a reservation had been made at the treaty for Elizabeth Lyons.   Elizabeth's Indian uncles and other relatives, were frequently at witness's house, and they always called Elizabeth, Mokitchenoqua.   Witness never heard the Indians claim any land before the Saginaw treaty, for Mokitchenoqua, or Elizabeth, but soon after the treaty, heard them say, that she, Mokitchenoqua, had land allotted to her at the treaty.   It was a matter of general notoriety that a section of land had been reserved for Elizabeth Lyons, at the treaty.

*Josette Knaggs.*   After the treaty of Saginaw, witness understood from the Indians, relatives of Elizabeth Lyons, that lands had been given to her at the treaty.   This was a short time after the treaty;—about three or four months. Heard it also from Indians of her, (Elizabeth's) tribe; heard Peter and James Riley say so.   It was generally reported by those that knew Elizabeth Lyons,—both among the whites and Indians,—that she had received a section of land at the treaty.   Witness's husband, Whitmore Knaggs, on his return from the treaty, told her a section

of land had been given to Elizabeth Lyons. Whitmore Knaggs was Indian agent and interpreter at the treaty ; he is now dead.

*Joseph B. Campau*, was not at the treaty. Elizabeth Lyons was brought up in his family. It was currently reported soon after the treaty, by those who were there, and others, that his little girl, as Elizabeth Lyons was then called, had had a section of land given to her at the treaty. Archibald Lyons, soon after the treaty, told witness so.

*Rufus Stevens.* Jacob Smith told witness section eight was reserved for Archibald Lyons's daughter. Has no recollection Smith said any thing about a reservation for an Indian daughter of his, but he went on to state that section seven was reserved for Edward Campau, section eight for Archibald Lyons's daughter, and others for his, (Smith's,) children, and that they made no claim on the south side of the river ; that his lands were on the north side of the river.

*Louis Moran.* Smith, when inquired of by witness, who owned certain land at the Flint, said that it was a section of land that had been given to Archibald Lyons's daughter by the Indian treaty.

*Antoine Campau*, was at the treaty. Archibald Lyons's daughter had a section of land reserved to her at the treaty, as witness heard, either at the time of the treaty, or immediately after.

*Louis Campau*, was present at the treaty. Resided at Saginaw at the time ;—was told at the time of the treaty by Elizabeth Lyons's grandfather, Ke-che-man-e-to, her father, and Captain Knaggs, the Indian agent, that her name was Mokitchenoqua. The cause of her being named Mokitchenoqua, as stated by Captain Knaggs, her father, and the chiefs, was, that they had gone to Governor Cass, and demanded that she should have a section of

land, and there was a section granted to her; but witness was not told where it was at that time. Jacob Smith told witness, Lyons's daughter had a section of land reserved for her at Shiawassee, near the big rock;—that Lyons had made application for a section of land for his daughter, under the name of Mokitchenoqua, and that he had stolen his, (Smith's,) daughter's name.

*John Bapt. Cochies*, was at the Saginaw treaty. To the question, " How did you know that Betsey, (Elizabeth,) Lyons had a reservation made at that treaty ?" He says, he " heard her father, the chiefs, the interpreters, and a great many others present, say she had a section of land reserved at the Flint, at the time of the treaty."

*John Bapt. Trudell*, was present at the treaty. Lyons's daughter had land given to her at the treaty. All of the Indian chiefs told witness she had land given to her;— they told witness so at the time of the treaty. Smith, while he resided at the Flint, told witness Lyons's daughter had a section of land on the opposite side of the river;—he spoke of it a number of times, and but a short time before his death.

*As-sin-o-ka-man*, was at the treaty. There was a section of land reserved for Wa-she-ba-ga's daughter, Mo-kitchenoqua. Wa-she-ba-ga applied to the chiefs for it, and they asked to have it reserved. He heard from the chiefs and others present, that it was located at the Grand Traverse. Wa-she-ba-ga was the Indian name of Archibald Lyons.

*Peter Whitmore Knaggs*, was at the treaty;—was present when the Indians, in council, agreed to reserve a section of land for the daughter of Archibald Lyons, at the request of Lyons.

The evidence decidedly preponderates in favor of the defendants. The most important witnesses on the part of

the complainants, are Cecil Boyer, and Macons, *alias* Esh-ton-a-quot.    The testimony of Macons I do not think en-titled to much weight, when opposed by the evidence on the defence.    He has evidently committed a number of gross blunders; and, although present at the treaty, he does not appear to have taken any part in it.    He did not know Smith claimed more than one section of land, for any of his children, or that more than four sections in all, were reserved at the treaty; one, as he says, for Smith's daughter, one for Mr. Boyer, and two for the Ri-leys.    He says Smith's daughter was at the treaty; that she came there with her uncle, Now-we-tuck-que-to, when in fact, she was at the time in the State of Pennsylvania. He never saw her before, and has not seen her since, and says she was then about fifteen years old.    She was in her tenth year only.    He also says that Archibald Lyons was not at the treaty, and that he did not come to the treaty ground until two days after the treaty was over; while the evidence is conclusive that Lyons was at the treaty.

Cecil Boyer's testimony is deserving of more conside-ration.    She was at the treaty, and was, as she says, told by Jacob Smith, To-an-dag-e-nee, Kish-caw-ko, and by all the other chiefs, that a reservation had been made for Mo-kitchenoqua, *daughter of Jacob Smith.*    She asked the chiefs for whom reservations had been made, and they told her she had one, and Mokitchenoqua had one, and a number of others had received one.    She at the time knew Smith had a daughter called Mokitchenoqua.    She also knew Lyons had a daughter, but did not know her name.    Now, it is possible the witness may be mistaken in saying the chiefs told her a reservation had been made for Mokitchenoqua, *daughter of Jacob Smith.*    These last words may have been suggested by her own mind, and not used by the chiefs.    She says she asked the chiefs, and

they told her she had one, and Mokitchenoqua had one, and a number of others had one; and knowing that Smith had a daughter named Mokitchenoqua, and not knowing any other person by that name, it was natural for the witness to suppose it was Smith's daughter that was meant. She could have drawn no other conclusion from the knowledge she previously possessed, and the information communicated. But she also heard there was a section reserved for Lyons's daughter at Shiawassee. Was not the same person and the same reservation referred to in both cases? I am inclined to that opinion. Smith told Louis Campau, Lyons had made application for a section of land for his daughter, by the name of Mokitchenoqua; and that he had stolen his, (Smith's,) daughter's name. He also said a reservation was made for her at Shiawassee. There were many reservations made by the treaty, to different persons, and at different places. The question of location was one of minor importance to the reservation itself, and it is not, therefore, at all surprising that there should have been different rumors as to the location, when there were none as to the reservees. The repeated declarations of Smith, after the treaty, that there was a section reserved at the Flint for Lyons's daughter, is almost conclusive of itself. He claimed five sections at that place, under the treaty, for himself, or children, and took possession of them; but he never claimed section eight. No one, perhaps, was more anxious to secure a personal advantage by the treaty, or knew better for whom reservations were made, than Smith himself.

While the bill, therefore, must be dismissed as to Williams and Pritchette, it is necessary to inquire what disposition must be made of it, as to the other defendants, against whom it has been taken as confessed. I think it should be dismissed as to them also. The complainants

have failed to show either legal or equitable title in themselves, which is necessary to entitle them to the relief they ask. The language of the act is, " any person having the possession and legal or equitable title to the lands." The object is not to fortify a bad title, or no title at all, by adjudications and releases, but to remove a cloud hanging over a good title, and casting a shade upon it. The defence made by Williams and Pritchette, enures to the other defendants. *Clason* v. *Morris*, 10 *J. R.* 524.

The bill must be dismissed as to all the defendants, with costs to Williams and Pritchette, but without costs to the other defendants.